## [No. 1915.]

### Howard Montresser *v.* The State.

1. RAPE — EVIDENCE — CASE APPROVED.— In Gazley's case, 17 Texas Ct. App., 267, a rule of evidence was correctly laid down as follows: "Though there may be a conviction for rape upon the uncorroborated testimony of the injured female, notwithstanding she be a child under the age of ten years, it is in that respect a case requiring special scrutiny by the jury, and a careful weighing of the evidence, with all remote and near circumstances and probabilities. In all such cases extraordinary effort should be made to secure circumstantial evidence tending to confirm the main witness." See the opinion *in extenso* for a case to which the rule is applicable, and the statement of the case for evidence *held* insufficient to support a conviction for rape.
2. SAME — NEW TRIAL — NEWLY DISCOVERED EVIDENCE.— See the statement of the case for newly discovered evidence *held* material for the defendant in a trial for rape of a female under the age of ten years.

APPEAL from the District Court of Dallas. Tried below before the Hon. G. N. Aldredge.

The conviction in this case, which was supplemented by an award of a term of twelve years and six months in the penitentiary, was for the rape of Emma Klapp, a female nine years of age, in Dallas county, Texas, on the 21st day of February, 1885.

The State first introduced the prosecutrix, Emma Klapp, a female child nine years of age. The defense objecting to the competency of the witness on account of her infancy, the witness was tested by the court, and by the defense under the direction of the court, through L. F. Bohoney, an interpreter, and, being pronounced competent, she testified as follows:

"My name is Emma Klapp. I am nine years old. I live next door to the Two Brothers' Saloon in Dallas. In February this man (pointing out the defendant) met me down stairs in his house, and told me to go up stairs with him; that he wanted to move some little tricks from one room to another, and wanted me to help him. I went up with him, and we moved some things into the fifth room from the Two Brothers' Saloon, the one next to the postoffice. He then locked the door of the room, threw me on the bed and pulled up my clothes. He then unbuttoned his pants and laid himself on me. He put his private parts into mine about so far (indicating about an inch on her finger). He pressed me so hard I could not scream. He laid on me about five minutes. He then let me up, opened the door, and told me not to tell my father. This was in Dallas county, Texas, in February, 1885."

Cross-examined, the witness testified as follows: "We moved some little flower pots from one room into another. When he laid himself on me he hurt me, but I could not scream. When he opened the door I went straight to my mother around the corner. Defendant did not give me any blocks or candy not to tell my father, but before that he gave my mother some blocks and candy. The defendant rumpled my dress when he had me on the bed. When I got home I found my mother sewing. She did not say anything to me about my dress nor ask where I had been. I did not tell her what the defendant had done to me. I did not tell her because I was afraid. I was afraid I would be punished. I saw my father at supper, but I did not tell him what the defendant had done to me. I was afraid. I was afraid of punishment. I ate supper as usual. It was about four o'clock when the defendant had me on the bed. It was Saturday evening. I did not change my clothes that night. Next day was Sunday. Sunday morning I changed my clothes. My mother did not ask me anything about being hurt, and I did not tell her. I ate breakfast and played around as usual. In the afternoon I went to the Texas & Pacific depot in Dallas, with my brother and other children. I was not sick on Saturday night nor on Sunday. I saw the first blood on Saturday night. I felt sore on Sunday night. I felt sorer on Monday than on Sunday night. I played with other children as usual on Monday, and played about as usual on Tuesday. I did not tell my mother nor my father what the defendant had done to me. I did not tell them because I was afraid I would be punished. The defendant did not give me any blocks or any candy. I never was in the defendant's house but once before. I never talked with him but once. It was on the street. He called me 'Little Dutchman.' I cannot speak English. I did not go to bed after the defendant hurt me. I was not sick. I did not tell my mother what the defendant had done to me until Wednesday. She and two doctors examined me on Wednesday. There is a vacant lot where they have dug away the sand, just east of where we live. I used to play there often with my brothers and sisters and other children. I don't think I said on the trial before the justice of the peace that the defendant gave me some painted blocks and some candy when he let me go out of the room. I don't think that I then said that he gave me those things not to tell my father. We all live in one room at home. The room is divided by a curtain. Neither my mother or father asked me anything about what was the matter with me until Wednesday, and I did not tell any one until Wednesday."

Wilhelmina Klapp, testifying through the same interpreter, stated in effect that she was the mother of Emma Klapp, the prosecutrix, who was but nine years old. On the morning of Sunday, February 22, 1885, witness observed blood spots on the sheets of the bed on which Emma slept. Witness washed off the blood spots, and thought nothing more of her discovery for the time being. She made no examination of Emma's person. On Monday and Tuesday mornings witness saw more blood spots, which she did not wash off, still thinking nothing of their import. On Wednesday morning Emma told witness that she had been outraged by the defendant. Witness immediately examined the girl's privates, and found them swollen and inflamed. She then had Doctors Ball and Gibbs called, who likewise examined the girl.

Cross-examined, witness said that she, her husband, Frederick Klapp, and their family removed from the German Empire to Texas in 1884, and settled in San Antonio in July of that year. Thence they removed to Dallas in December of the same year. They occupied a house fronting on Main street, next door to the Two Brothers' Saloon. The defendant lived in a house immediately in the rear of the said saloon, his and witness's having a common back yard. Witness had never been inside of the defendant's house, and prior to this outrage had seen him but a few times. She was not acquainted with the defendant's wife. Witness saw her daughter Emma on the evening of Saturday, February 21, 1885. She was then in the same room with witness. She manifested no excitement or other unusual emotion, so far as the witness observed. Witness noticed nothing unusual in her person or demeanor either then or at supper. Witness changed Emma's clothes on Sunday morning, but observed nothing unusual about them. The child ate breakfast on that morning in her usual spirits and with her usual appetite, and afterwards played as usual with other children. Witness did not know where Emma went to on that day. The only change witness could notice in Emma on Monday and Tuesday was a partial loss of appetite, and a disposition to lie around the house on the beds. She appeared at table at meals on both of those days. She did not complain in the least, until Wednesday morning, when witness examined her and found her privates swollen and sore. Witness applied wet cloths to the parts and went for Doctor Ball, who came and examined the child. Doctor Gibbs examined her on the next day. On the Saturday evening of the outrage, the defendant gave witness some small toy blocks and some cakes, but no candy. The witness divided the blocks and cakes among her children. Witness's children frequently played in the vacant lot east of the house.

Doctor Gibbs was the next witness for the State. He testified that he was called to examine the person of Emma Klapp on Thursday, February 26, 1885. He made an ocular examination of her private parts, and found them inflamed, swollen and somewhat lacerated. Witness's examination extended only to the hymen. It was his professional opinion, based upon that examination, that the girl's sexual organ had been penetrated to the hymen by the male organ.

On cross-examination witness stated that on the day before he saw the girl Doctor Ball had made a digital examination of her privates. It was the opinion of the witness that Doctor Ball introduced his finger into the girl's sexual organ as far as the hymen, but he did not think that such introduction of his finger by Doctor Ball injured the hymen at all. Witness could not, knowing that previous to his examination the parts had undergone digital penetration, say positively what caused the original disorganization of the hymen. He could not testify positively that the condition in which he found the girl's privates was the result of penetration by a male member. It might have been caused by other violence, such as falling, or bringing the parts into severe contact with some other foreign body. Witness's examination was confined to the exterior canal, and was made after Doctor Ball's digital examination. The State rested.

Mrs. Ida Montresser, the defendant's wife, was his first witness. She testified that, in February, 1885, she and her husband lived in the two-story house immediately in the rear of the Two Brothers' saloon, in Dallas, Texas. Witness did not know Emma Klapp's parents, though she had seen them a few times. Witness never saw Emma Klapp in the defendant's house. Defendant and witness were then keeping a boarding and lodging house. They had dinner about half-past 12 o'clock on Saturday, February 21, 1885, the day of the alleged outrage. Dinner occupied over an hour. The defendant was present at dinner as usual on that day. He left the house after dinner, and witness, Mrs. Peel and a servant cleaned up and went to washing clothes down stairs. They gathered some clothes, sheets and pillow cases from the rooms up stairs. After a time the defendant, who was then wanted for some purpose or other, came back to the house, and witness asked him where he had been. He replied by passing his hand over his face, to indicate that he had been to be shaved. Defendant soon left again, saying that he had business with Mr. Crozier to attend to, and witness saw no more of him until supper-time. When the defendant went back to town Mrs. Peel and witness proceeded with the washing. When

they had done they took some of the articles up stairs and hung them on the banisters; others they hung in the alley near the stairs. Witness and Mrs. Peel, during the time they were engaged in washing, passed continually up and down stairs. The washing occupied an hour and a half or two hours of time. Witness and Mrs. Peel then went up stairs and swept out the rooms, and, when through, witness went to the room next to her private room, which was the second room from the end of the house next to the Two Brothers' Saloon, and built a fire, sat down and read. The door of that room was left partly open, and if any person had passed along the hall, or been up stairs, the witness would certainly have heard them. She saw no one and heard no one. At about 5 o'clock Mrs. Peel went down stairs to begin preparing supper. Witness did not go down for some time later. Defendant returned to his house at supper-time. Witness could observe nothing unusual in his manner or appearance. Defendant conducted his business in his usual manner until the following Wednesday, when he was arrested on the charge of having outraged Emma Klapp. The house was constructed of very light material, and sounds or noises were easily heard from one room to another. Trouble then and yet existed between defendant and Frederick Klapp. It arose over Klapp's practice of emptying waste-water from the vats he used in his dyeing business in the back yard, from whence it spread to that part of the yard adjacent to defendant's back door. Witness twice heard her husband protesting to Klapp about that practice, and trying to make him understand that he must quit emptying his dye-slops in that yard, and she knew that, a day or two before his arrest, the defendant complained to a peace officer about the nuisance. Witness did not know whether or not the officer ever spoke to Klapp about it. Witness and defendant had no children.

Cross-examined, the witness stated that she married the defendant in Fort Worth about three years prior to this trial, and had lived in Dallas with him about two years. Defendant was a printer when witness married him. When witness married defendant, she was living with her father's family. Witness had seen George Holland, the variety theatre man, but had no personal acquaintance with him, and had never spoken to him. She had never played in a variety theatre.

Mrs. Peel was the next witness for the defense. She testified that in February, 1885, she was in the employ of the defendant and Mrs. Montresser as cook and house servant. Witness remembered

distinctly how she was employed on Saturday, February 21. After dinner she and Mrs. Montresser washed articles of apparel and bed linen, being so engaged for about two hours. As they would finish each piece they would take it up stairs and hang it on the banisters to dry. That work kept the witness passing up and down stairs every few minutes during the two hours. Witness was satisfied that no one could have gone up stairs during that time without being heard by her. After finishing the washing, the witness and Mrs. Montresser went up stairs, and were engaged some time cleaning up and straightening beds. Mrs. Montresser left the witness cleaning up and went to her room. Witness did not see the defendant nor Emma Klapp up stairs during that evening, nor did she hear them, and she did not think it possible for them, or either of them, or anybody else, to get up stairs during that time, unseen or unheard by her. It was an easy matter to hear a person going up stairs from the point where witness and Mrs. Montresser did the washing.

Cross-examined, witness stated that she saw the defendant at dinner on the Saturday in question, and not again until late in the evening, when, as defendant appeared, she said to Mrs. Montresser, who was waiting to see him: "There is Mr. Monte now." Mrs. Montresser replied: "Yes, he has been to get shaved." Sounds or noises of any kind were easily heard from one room to the other in the Montresser house. Witness had never seen Emma Klapp in the defendant's house. Witness saw, and heard defendant complain once to Klapp about emptying slops in the back yard.

Captain West testified, for the defense, that he was a civil and constructing engineer. He had lived as a boarder at Montresser's house for more than a year. In February, 1885, witness occupied the room up stairs next to the postoffice, fronting west. The second story of the house was divided into eight rooms, constructed of very light material, and sounds were very audible from one room to another. Witness was away from the house on business all day on the Saturday of the alleged offense. Witness saw the defendant at supper on that night. He appeared as usual. Witness saw him at meals from Saturday night until his arrest on Wednesday, and observed nothing unusual in his demeanor or appearance.

Cross-examined, witness stated that he had his son with him in Dallas, and had no other family. Witness went with Mrs. Montresser to Mrs. Morrell's, but not to get any one to charge the outrage of Emma Klapp upon a barber who lived at Mrs. Morrell's. He went because Mrs. Montresser requested him to go with her, she

having received a letter on the night after defendant's arrest, stating that the writer could, if applied to, give her valuable information.

Larkin Stephens testified, for the defense, that some time after dinner on Saturday, February 21, 1885, a man who resembled defendant very much inquired of him directions to the house to which Mr. Crozier had recently moved.

Mr. Crozier testified, for the defense, that during the afternoon of February 21, 1885 (Saturday), a gentleman whom the witness thought was defendant called at his saloon and asked and received directions to the house of Mr. Crozier, the brother of the witness. Witness did not remember the hour that he called, nor that on the examining trial, he, witness, testified that it was 6 o'clock.

Mr. Louden testified, for the defense, that he lived some three or four blocks from the defendant's boarding-house. Defendant called on witness some time during the afternoon of Saturday, February 21, 1885, and rented a stove from the witness, which stove was for use in his boarding-house. Witness could not testify as to the hour this call was made.

Captain Ed. Cornwall, deputy city marshal, testified, for the defense, that, a day or two prior to the arrest of defendant, he, defendant, complained to witness that Klapp, who kept a scouring and dye shop on the premises adjoining his boarding-house, committed a nuisance by emptying slops at his back door. Witness could not say that Klapp did or did not know of this complaint.

Coleman Lang testified, for the defense, that he was a hod and mortar carrier. On Saturday, February 21, 1885, witness was at work on a brick building on Elm street, from which place he could see all over the vacant lot which faced Main street, immediately east of the Two Brothers' Saloon. That lot was frequented daily by the white children of the neighborhood, who played in the excavation made there in getting sand used on the building on which witness was at work. The little boys and girls played at that place by dragging each other rapidly down the bank by an arm or an ankle. Witness called the attention of a fellow workman to the fact that the little boys played with the little girls in that manner. Witness did not know Emma Klapp, and could not say that she ever played in that manner.

Doctor H. L. Moseley was next introduced as a medical expert, to whom the defendant stated the following as a hypothetical case: " In case a female child of nine years of age was subjected to the unrestrained attempt of an adult male person at carnal intercourse,

for the space of five minutes, or even less, what would be the immediate and proximate result on the child's physical constitution and nervous system? And what would be the condition of her private parts?"

The witness answered: "The result of such an attempt on the child's nervous system would be to shock it greatly, and to produce great excitement and pain. The child's private parts, after such an attempt, would be much lacerated, which laceration would be manifested by bleeding in proportion to the violence used. In such a case, I hardly think the child could conceal her condition from those around her for any length of time. I do not think that she could walk next day with ease, nor do I think she could conceal her condition from those seeing her. There is a disease known to our profession sometimes found in the young female, which presents much the appearance of the private parts as if they had been bruised or hurt. That is, the parts appear inflamed and swollen, but would not be lacerated. I have had several such cases here in my practice. It is caused by uncleanliness or bad blood."

Cross-examined, the witness said: "A child, as in the hypothetical case stated, might be able to walk next day. It might not be impossible. It would depend much upon the degree of violence used in the attempt at carnal intercourse. In the case stated, the private parts after four or five days would be inflamed and swollen."

Doctor E. H. Ayers was next introduced by the defense. The same hypothetical case was submitted to him. He answered it substantially as did Doctor Moseley, declaring the generative organ of the female to be one of the most sensitive nerve-centers about the female system.

Having laid the proper predicate, the defense next introduced in evidence the record of the testimony of Emma Klapp as given before the examining court. It reads as follows:

"I am nine years old. I live at the Two Brothers' Saloon on Main street. I don't know H. Montresser by name, but I have known this defendant since he moved there. Two weeks ago, Saturday afternoon, some time after dinner the defendant had used me in the house back of their own house in the second story. He called me up there. He said that he had some nice small tricks that he wanted to fix in a room up stairs, and that he wanted me to help him, and called me up there. He then threw me on the bed. After he threw me on the bed, he unbuttoned his breeches, lifted up my clothes, laid himself down on me, and pressed me so hard with his private parts in mine that I could not scream. He

did this about five minutes. He did not get it into me. I found the first blood between Saturday and Sunday. He got into me about one inch. It was the defendant. I do not know what a county or State is. The house in which the defendant did this to me faces Sycamore street in Dallas."

Cross-examined: " After I got up off the bed defendant unlocked and opened the door, and gave me some candy and some blocks not to tell my father. I went down on the street and went home. I saw only my mother when I first got home. We only have one room in our house, and that is divided with curtains. I think my mother was sewing when I got home. My father was in the city. I did not tell my mother right away what the defendant had done to me, because I was afraid I would be punished. I first told her on Wednesday. I think that I saw my father on the day that the defendant abused me. I told my father on Wednesday. He told me I should not go into that house any more. The defendant gave me some lettered blocks that children play with. He did not give me any candy. When I left the house, I went down the first pair of steps, and direct home to my mother. I did not have any blocks. (This statement was made in reply to the question as to what she did with the blocks.) When I told my father, he said nothing more than that I should not go to the defendant's house again. I do not know the defendant, and only saw him when he moved there. I was not often in the defendant's house after he moved there. When he called me the defendant stood up stairs at the back part of the house. He called me from the street into the room fronting the street. Nobody was with me at the time. I was not sick on Saturday night. I was at the depot on Sunday afternoon. I did not change my underclothes on Sunday. I did not look for blood, but saw blood on my clothes on yesterday. I felt the first pain on Sunday afternoon. I walked as far as the depot on Sunday afternoon. I did not hurt myself with my own hands. My father told me what the truth is, and told me that (I must swear to ?) nothing but the truth. Two doctors examined me, one on yesterday, and both of them this morning. My father did not examine me, but my mother did. My mother examined me on yesterday, but knew it on Wednesday. She saw the spots on the sheets before she examined me. I put on a skirt on Sunday and another on this morning. There was blood on the skirt I took off on Sunday, and my mother saw it on Monday, but said nothing to me about it. When she found out I was hurt, she asked me who did it. I told her that the defendant did, and she said I should not go to his house again. This conversation occurred

on yesterday. I was sorer on Monday than Sunday, and sorer on Tuesday than on Monday. The reason my mother examined was that she saw blood on my skirt. She saw that blood on Monday. My father did not tell me to point out the defendant as the man who hurt me, when I came into this house. He did not tell me what would be the truth in this case. No one else hurt me in the way that defendant did. I do not know the hour he hurt me. It was along in the evening after dinner, about 4 o'clock. Defendant did not give me any blocks after he hurt me, but before he did so he gave my mother some painted blocks. He talked to me once, about a week before he hurt me. He was then marketing on the street. I did not help the defendant move any articles from the Two Brothers' Saloon to where he now lives. I was afraid when the defendant was on me. I could not scream because the defendant pressed me too tight. I was afraid to scream when the defendant let me up. Defendant, when he let me out, promised to give me some candy and some blocks if I would not tell my father. My father did not tell me anything to say. I saw the defendant, whose name is Montresser, about three times before he hurt me, and have seen him about four times since. My dress was rumpled during the defendant's outrage upon me. My mother did not ask me who rumpled it. I do not know the defendant's wife, but have seen her. I did not see any other man about defendant's house who looked like him, on the Saturday of the outrage. I saw no one when I went up stairs. None of the doors were open. Defendant called me by my name. I do not understand the English language."

Re-examined, the witness said: "The defendant does talk German a little." Re-crossed: "He did not speak in German." Re-examined: "I can talk a little in English." The defense rested.

The State introduced Richard Blasdell in rebuttal. He testified that he was, at the time of this trial, employed in a restaurant in Dallas. Some time prior to this alleged offense, witness was in the employ of the defendant as night clerk. He was not in defendant's service on Saturday, February 21, 1885, but was at his house on that day, and sat in the office nearly the whole of the evening. While there witness heard a noise in the back room. He got up and looked into the dining room, where he saw defendant and Emma Klapp, who seemed to witness to be embracing.

Cross-examined, the witness stated that the defendant had discharged him about one week before Saturday, February 21, 1885. Witness had no particular business at the boarding-house on that day, but went there and sat about the office pretty much all even-

ing. Upon reflection, witness was unable to say positively whether it was on the afternoon of Friday, February 20, or Saturday, February 21, that he saw defendant and Emma Klapp embracing in the dining room. Witness did tell E. W. Roberts, a newspaper reporter, that he knew nothing about the case, and told him so to put a stop to his troublesome questions. Witness did not tell Roberts that he knew nothing about the case, but would do all in his power to hang defendant. Witness told Roberts that he, witness, could probably hang defendant. Witness did not tell Roberts in the court-house, that he, witness, had given himself away, but that if he, Roberts, gave witness away, witness would expose him, Roberts. Witness had no love for defendant, who was in his, witness's, debt.

The defendant then introduced E. W. Roberts in rebuttal. Roberts testified that he was a reporter on the staff of the Dallas *News*. He knew Blasdell, who often talked to witness about this case, and had as often said that he knew nothing whatever about it, but was going to do all he could to hang defendant. Blasdell, on the day prior to this testimony, told witness in the court-house that he had given himself away, but that if witness testified against him he would expose witness. He told witness that he was going to set himself right before the jury by admitting that he told witness he knew nothing about the case, but was going to say that his reason for so telling witness was that he did not want to tell witness anything about it.

The defendant's motion for a new trial was based partly upon newly discovered evidence, and is supported by the affidavits of Heze and Naomi Rupert. Their affidavits affirm that they lived next door to Frederick Klapp's house, where the prosecuting witness Emma Klapp lived; that both prior and subsequent to the trial and conviction of defendant, the said Emma Klapp had told them that the defendant had never, at any time or place, attempted to outrage her, or assault her; that he had never even touched her, and that the said Emma, to their positive knowledge, was fluent in the use of the English language, and understood it perfectly.

*Reeves & Spence* filed an able brief and argument for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

Willson, Judge. This appeal is from a conviction of the crime of rape committed upon Emma Klapp, a female child nine years of

age. It is founded mainly upon the testimony of the child, which is uncorroborated except in the fact that in some way the private parts of the child had been injured. We will not here recite the evidence in detail, as it will be given by the reporter. Suffice it to say that, in our opinion, the evidence for the prosecution is to our minds unsatisfactory. It does not meet the demands of the law in cases of this character.

The testimony of the child is in many respects open to suspicion. Her tender years rendered her susceptible to the influence of malicious and designing persons, and it was shown that her father and the defendant were not upon friendly terms. She testified through the medium of an interpreter, stating that she could not speak the English language, but could only speak the German language, and yet she detailed conversations which she had had with the defendant, who, it was proved, could not speak the German language. She made no outcry when she was outraged. She made no complaint of the outrage for more than three days after it occurred. She went about and played with other children as usual. No traces of the outrage were discovered upon her clothing, nor did her appearance and demeanor indicate that she had been injured, except that upon examination, on the fourth day after her alleged injury, her private parts were found to be swollen, sore, inflamed and somewhat lacerated, as if they had been penetrated by the male organ. The place where she located the commission of the crime was a room in the second story of defendant's house, which house was in the city of Dallas, adjacent to other houses which were at the time inhabited, and very near also the house of her father. Defendant's house was lightly constructed of wood, and a noise in one part of the house would pervade the whole building. She stated that the crime was committed about 4 o'clock, P. M., on Saturday, the 21st of February, 1885. During the whole of that evening defendant's wife and a servant woman were in and immediately about the house; heard no noise up stairs — did not see the child on the premises, and did not see the defendant there from soon after dinner until supper time. So they testified.

The mother of the child did not observe that anything was wrong with the child until Wednesday, the fourth day after the alleged outrage. She noticed blood spots on the bed where the child had slept on Sunday, Monday and Tuesday mornings, but, strange to say, did not inquire into, or make any examination to ascertain the source or cause of such spots. A physician, Dr. Gibbs, made an ocular examination of the child's private parts on the fifth day

after the alleged rape.   He testified that on the day previous Dr. Ball had made a digital examination of the child's private parts. Dr. Ball was not produced as a witness by the prosecution, nor is any reason given why he was not produced.   It is reasonable to conclude that Dr. Ball's testimony would have been more definite and satisfactory in regard to the nature and extent of the injuries, and their probable cause, than is the testimony of Dr. Gibbs, from the fact that Dr. Ball made the first and the more thorough examination.   His testimony, if attainable, should have been produced by the State.   In a case like this the State should not stop short of adducing all the evidence within its reach which is calculated to throw light upon the transaction and develop the truth.   (*Gazley v. The State*, 17 Texas Ct. App., 277, and authorities there cited.)

In view of the unsatisfactory evidence of the State; the exculpatory evidence of the defendant; the singularly lenient punishment assessed, indicating that the jury were not fully satisfied as to defendant's guilt, and the newly-discovered evidence set forth in defendant's motion for a new trial, we think the court below erred in refusing the defendant a new trial; and because of such error the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[Opinion delivered November 11, 1885.]